**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

|  |  |  |
|---|---|---|
| **DEBORAH HECKENSWILER, on her own behalf, and as Administratrix of the Estate of John Heckenswiler, deceased, et al.,** | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| **Plaintiffs,** | : | |
| **v.** | : | **CIVIL NO. 06-4151** |
| | : | |
| **CHIEF BRIAN K. MCLAUGHLIN, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

_____

**MEMORANDUM OPINION & ORDER**

Rufe, J.                                             September 29, 2008

Plaintiffs Deborah Heckenswiler[1] and Terry Musselman bring this action against

Defendants Chief Brian K. McLaughlin, Sergeant Edward C. Murphy, Chief James Donnelly,

Colonel Jeffrey B. Miller, John/Jane Does 1-20, Springfield Township, Bucks County, the

Pennsylvania State Police ("PSP"), and the Commonwealth of Pennsylvania ("Pennsylvania"),

alleging violations of the Fourth and Fourteenth Amendments of the United States Constitution,

the Americans with Disabilities Act[2] ("ADA") as well as certain state laws, during the attempted

execution of a warrant for the involuntary mental-health commitment of John Heckenswiler

("Decedent") in September of 2004.  Now before the Court are Defendants' Motions for

---

[1] The Court will refer to Plaintiff Deborah Heckenswiler as "Plaintiff Heckenswiler" when discussing her in her individual capacity, but as "Administratrix" when discussing her as the representative of John Heckenswiler's estate.

[2] 42 U.S.C. §§ 12101-12213 (2008).

Summary Judgment.[3]  For the reasons set forth below, the motions will be granted in part and denied in part.

## I.  BACKGROUND

This case arises from the suicide of Decedent on September 16, 2004.  Four to six weeks prior to his death, Decedent began acting strangely.[4]  His son was diagnosed with Attention Deficit Hyperactivity Disorder early in August 2004.[5]  Following his son's diagnosis, Decedent stopped sleeping, staying up all night doing research on the computer.[6]  He slept only a few hours every two to three days.[7]  He stopped going to work.[8]  He believed people were talking about him at work and at his son's school.[9]  According to his wife, Plaintiff Heckenswiler, he believed there was a conspiracy against him.[10]  Plaintiff Heckenswiler also stated that Decedent suffered from delusions, thinking that "people were in the trees, that the phones were bugged, he was misinterpreting what people were saying, [and] helicopters flying over he thought were spying on

---

[3] Defendants have filed the following Motions for Summary Judgment: "Defendants, Brian K. McLaughlin and Springfield Township's Motion for Summary Judgment Pursuant to Federal Rule of Civil Procedure 56" [Document No. 51] ("Tp. Defs.' Mot."); "Motion for Summary Judgment of Defendant James Donnelly" [Document No. 53] ("Def. Donnelly's Mot."); and "Co-Defendant County of Bucks' Motion for Summary Judgment Under Federal Rule of Civil Procedure 56(b)" [Document No. 58] ("Def. Bucks County's Mot.").  Also filed was "Defendant Pennsylvania State [sic], Miller and Murphy's Motion for Summary Judgment" [Document No. 52] ("PSP Defs.' Mot."), which was filed on behalf of Defendants PSP, Miller and Murphy.  Neither Pennsylvania nor John Does 1-20 filed motions for summary judgment.

[4] Pl.'s Resp. to PSP Defs.' Mot. [Document No. 68] Ex. A [Document No. 76] (Deposition of Deborah A. Heckenswiler ("Heckenswiler Dep."))  at 9:7.

[5] Id. at 95:18-24.

[6] Id. at 95:4-8.

[7] Id. at 109:10-24.

[8] Id. at 9:1-10.

[9] Id. at 10:12-13.

[10] Id. at 10:1-2.

him."[11]  Decedent also told his wife that "people were shining lights into the house."[12]
Decedent's father, Ralph Heckenswiler, believed Decedent was paranoid after Decedent told him
"there were lights in the trees and people walking around outside his house and noises."[13]
Decedent did see his family doctor in August 2004 and was prescribed Ambien and Effexor.[14]
Decedent said the medicine made him feel like he was dying inside, and according to Plaintiff
Heckenswiler, only took each medication once.[15]

On September 14, 2004, after Plaintiff Heckenswiler returned home from work, Decedent
began  "shredding stuff from work, CDs, papers."[16]  At some point that night, Decedent asked
Plaintiff Heckenswiler when she was going to "come clean about the 15th."[17]  According to
Decedent's sister, Dawn Witts, Plaintiff Heckenswiler found this very upsetting, since she had no
idea what he was talking about.[18]  That night Plaintiff Heckenswiler moved out of the house with
their son, Zach, telling Decedent that they would come back if he got help.[19]

Following Ms. Witts' advice, Plaintiff Heckenswiler went to the Penn Foundation on
September 15, 2004 to get a warrant for the involuntary mental health commitment of Decedent,

---

[11] Id. at 60:12-18.

[12] Id. at 109:8-9.

[13] Pl.'s Resp. to PSP Defs.' Mot. Ex. D (Deposition of Ralph Heckenswiler ("Ralph Dep.")) at 17:3-10, 19:3-14.

[14] Id. at 53:8-20.

[15] Id. at 53:21-54:4.

[16] Id. at 17:4-5, 120:1-5.

[17] Id. at 165:13-24.

[18] Pl.'s Resp. to PSP Defs.' Mot. Ex. C (Deposition of Dawn Witts ("Witts Dep.")) at 26:16-24.

[19] Heckenswiler Dep. at 14:17-24, 15:21-24.

otherwise known as a "302."[20]  Plaintiff Heckenswiler claims that "Debbie" of the Penn

Foundation explained to her that "in order for the judge to accept a 302 it had to look like John

was either a harm to himself or to others."[21]  Plaintiff Heckenswiler admits to signing the

affidavit for the 302, but she claims it was exaggerated.[22]  Specifically, Plaintiff Heckenswiler

claims Decedent was not extremely agitated, confrontational, irate or irrational on the evening of

September 14, 2004, but rather just mad and irritated.[23]  Moreover, although Decedent did carry a

handgun around for the two weeks prior to September 15, 2004, she was not sure if it was

actually loaded.[24]  According to Plaintiff Heckenswiler, at the time she applied for the 302, she

---

[20] Id. at 23:1-15; A 302 is a warrant for an emergency examination issued "[u]pon written application by a physician or other responsible party setting forth facts constituting reasonable grounds to believe a person is severely mentally disabled and in need of immediate treatment . . . to take such person to the facility specified in the warrant," in accordance with Pennsylvania's Mental Health Procedures Act.  70 Pa. Stat. § 7302(a)(1)

[21] Id. at 24:6-8.

[22] Id. at 24:9-14, 30:3-8, 31:8-11; see also Pl.'s Resp. to PSP Defs.' Mot. Ex. A (Warrant), which states:

> my husband John has had a complete change in mental status. He is extremely paranoid and suspicious. He is misinterpreting information  He is accusing co-workers (18 yr work hr software engineer) of a conspiracy and has refused to return to work x 1 month until it is "cleared up" John currently believes that I am part of this conspiracy.  He believes that the phones are bugged He has stopped sleeping upstairs.  For the last 2 wks he has remained in the downstairs portion of our home.  He had gone 1 wk without sleep completely 1 month ago.  His symptoms surfaced at the same time our son began testing for ADD.  John became consumed with researching this diagnosis.  It has brought to his attention many childhood issues of his own (John's deceased mother was mentally ill and suffered from alcohol issues) last night John present John has been carrying a loaded handgun for the last 2 wks. He even takes it into the bathroom and wraps it in a towel while he is in the shower.  He refuses to tell me why he feels he needs protection.  Last night John was extremely agitated.  He was confrontational.  He demanded I explain to him "When are you going to come clean about the 15th?"  I do not know what he means.  When I could not explain he was irate and irrationa.  I packed belongings and took my son to my parents house.  Just before I left John headed toward the closet where he keeps 2-3 rifles.  I love my husband and I know that something is wrong.  By history he is stable and loving.  I believe that he needs immediate mental health treatment which he has been refusing.

(errors in original).

[23] Heckenswiler Dep. at 31:12-32:2.

[24] Id. at 158:7-19.

4

did not believe Decedent was a danger either to himself or to others, but just wanted to get him help.[25]

"Debbie" then called the Springfield Township Police to arrange execution of the warrant.[26]  Plaintiff Heckenswiler spoke with Defendant McLaughlin, Chief of the Springfield Township Police Department, and answered his questions about Decedent, including "information as far as his background . . . what type of mannerisms he had in the past, how his condition has been deteriorating over time, questions about his propensity towards violence, [and] weapons in the house."[27]  According to Defendant McLaughlin, Plaintiff Heckenswiler also told him she left her house in fear for her own safety and that she had concerns for the safety of Ralph Heckenswiler, who had plans to go to breakfast with Decedent.[28]  After the phone call, Plaintiff Heckenswiler returned to her parents' home.[29]

Meanwhile, Defendant McLaughlin requested that the warrant be faxed to him directly.[30]  Once it was, he arranged for three officers to accompany him to serve the warrant, including Officer McDonald and Officer Laudenslager from the Springfield Township Police Department and Officer Kisthardt from the Richland Township Police Department.[31]  Officer Kristhardt was

---

[25] Id. at 24:9-14, 146:13-147:4.

[26] Id. at 35:8-20.

[27] Id. at 35:21-36:8, 172:10-174:2; Tp. Defs.' Reply Ex. F (Deposition of Brian K. McLaughlin ("McLaughlin Dep.")) at 8:1-5.

[28] McLaughlin Dep. at 7:8-13.

[29] Heckenswiler Dep. at 174:8-10.

[30] McLaughlin Dep. at 8:7-8.

[31] Id. at 8:8-12, 9:4-5.

a member of the Central Bucks Special Response Team ("CBSRT"),[32] and his chief would

monitor the situation in the event mobilization of CBSRT was required.[33]  To avoid alarming

Decedent, Defendant McLaughlin decided only he and Officer MacDonald would make contact

while the other two officers maintained their distance.[34]  Defendant McLaughlin approached

Decedent, identified himself and explained that he had come to execute a 302 warrant initiated

by Plaintiff Heckenswiler.[35]  The parties dispute, however, the following events which led to

Decedent barricading himself in his house.

Defendant McLaughlin claims that as he and Decedent talked, Decedent became nervous,

checking behind him as he began to back up slowly towards the house.[36]  When Decedent had

moved about five feet or so from the back door, Defendant McLaughlin asked him if he was

armed and Decedent answered that he was.[37]  Decedent suddenly turned and bolted for the house

door, but Defendant McLaughlin managed to get a hold of his arm and tried to pull him back

---

[32] The exact name of this organization is disputed.  CBSRT is the name reflected on the organization's internal event log detailing the negotiations with Decedent, its call-out summary of the incident, and the Doylestown Township Police Department website.  (Pl.'s Resp. to PSP Defs.' Mot. Ex. E at P89-P104, P138; Def. Bucks County's Reply Ex. 4.)  Plaintiffs also refer to it as the Central Bucks Special Response Team, but state that it identifies itself as the Bucks County Regional Response Team.  (Pl.'s Resp. to Def. Bucks County's Mot. [Document No. 69] ¶ 2.)  Defendant McLaughlin refers to the group as the Bucks County Tactical Team.  (McLaughlin Dep. at 9:16-17.)  Defendant Bucks County claims the organization's name is Central Bucks Emergency Response Team.  (Def. Bucks County's Reply ¶ 7.)  Defendant Donnelly refers to it as the Central Bucks Emergency Response Team.  (Def. Donnelly's Reply Ex. 7 (Affidavit of Chief James Donnelly ("Donnelly Aff.")) ¶ 5.)  It is the Court's understanding that each of these names refer to the same entity which,  for consistency herein, the Court will refer to as CBSRT.

[33] McLaughlin Dep. at 9:15-25.

[34] Id. at 13:13-17.

[35] Id. at 14:8-10.

[36] Id. at 14:23-25.

[37] Id. at 15:6-10.

out.[38]  At that point, the glass door shattered all over Defendant McLaughlin causing him to lose

his grip on Decedent, who dropped to the floor.[39]  Defendant McLaughlin and Officer McDonald

followed Decedent inside at which point, Defendant McLaughlin claims Decedent "reached into

his waist band, pulled the gun and pointed it at us—directly at me actually and continued kind of

crawling like pushing himself backwards while he was pointing the gun."[40]  Defendant

McLaughlin claims he then yelled "gun" and made a hasty retreat with Officer McDonald.[41]

According to Defendant McLaughlin, Ralph Heckenswiler was standing outside on the

side porch.[42]  Defendant McLaughlin and Officer McDonald then pushed Ralph Heckenswiler

around the corner of the house and explained to Ralph Heckenswiler what had happened.[43]

Defendant McLaughlin then used his cell phone to get in touch with Decedent, convincing him to

talk first by phone and then in person.[44]  While they were talking, CBSRT was activated to

manage "a barricaded subject in a house."[45]  Defendant McLaughlin claims that when they were

talking at the door, Decedent still had the gun tucked in his waist.[46]  He also states that Ralph

---

[38] Id. at 15:20-16:3.

[39] Id. at 16:3-7.

[40] Id. at 16:7-14.

[41] Id. at 16:15-22.

[42] Id. at 16:23-24.

[43] Id. at 16:25-17:8.

[44] Id. at 17:9-14.

[45] Id. at 19:20-23.

[46] Id. at 17:14-15.

Heckenswiler could hear Decedent, but could not see him from where he stood.[47]  Defendant McLaughlin told Decedent his father would stay with him when they went to the hospital and at one point, Decedent even offered to come out.[48]  But upon hearing the wail of a siren, Decedent looked around, became very nervous and "shortly thereafter ended up shutting the door and retreating back into the house."[49]  Defendant McLaughlin decided to retreat in light of the firearms reportedly in Decedent's possession, maintaining a perimeter until CBSRT arrived.[50]  Defendant McLaughlin did establish phone contact once again with Decedent, continuing to talk to him and listening to Decedent's demands for cigarettes.[51]  Defendant McLaughlin claims he kept Decedent on the phone until he was needed at the command post at Springfield Township Building.[52]

In his deposition, Ralph Heckenswiler claims that Decedent only fled towards the house when the officers "went to grab for him."[53]  He agrees that at some point during the initial conversation, Decedent told Defendant McLaughlin that he was armed, though he denies seeing any weapons on his son.[54]  According to Ralph Heckenswiler, the door broke when Defendant McLaughlin and Officer MacDonald followed Decedent into the house, trying to get through the

---

[47] Id. at 17:21-24.

[48] Id. at 17:17-18:10.

[49] Id. at 19:4-11.

[50] Id. at 19:12-16, 20:2-3.

[51] Id. at 19:16-19.

[52] Id. at 19:23-25, 20:7-10.

[53] Ralph Dep. at 12:22-25.

[54] Id. at 11:21-12:7.

door at the same time.[55]  In backing away, Decedent stumbled and the front of his shirt flipped up in the air, exposing what appeared to be the handle of a pistol.[56]  Ralph Heckenswiler heard someone holler "gun" and both officers came out of the house.[57]  During these events, Ralph Heckenswiler was situated right in the doorway, holding the door.[58]  He claims Decedent never pointed a gun at Defendant McLaughlin and that there was no way Decedent could have done so without him seeing it.[59]

Ralph Heckenswiler claims he then stayed on the porch with Defendant McLaughlin, while Decedent stayed downstairs, talking through an open door.[60]  He claims to have observed Officer McDonald retrieve Decedent's cigarettes from his car and watched as Defendant McLaughlin lit two cigarettes for Decedent, although they did not talk much while Decedent smoked them.[61]  At some point, he heard Decedent say he was going to get a drink and went inside for some orange juice.[62]  After a few sips, Decedent shut the door, turned around and went back in towards the kitchen.[63]  Officer McDonald urged Defendant McLaughlin to leave, but Defendant McLaughlin stayed for a few minutes without backing up after Decedent had gone

---

[55] Id. at 13:1-5.

[56] Id. at 13:6-9.

[57] Id. at 13:9-11.

[58] Id. at 38:9-12.

[59] Id. at 40:4-41:8

[60] Id. at 13:12-15, 19-21, 15:8-11, 41:23-42:1.

[61] Id. at 13:22-14:5.

[62] Id. at 14:6-8.

[63] Id. at 14:8-11.

inside.[64]  Ralph Heckenswiler was eventually told to go across the street to wait, but as he was leaving he heard someone say, "They're going to be here soon," and Defendant McLaughlin respond, "Well, who called them?"[65]  It is undisputed that Ralph Heckenswiler was then taken to Springfield Township Building, where he remained until leaving for breakfast the next morning on September 16, 2004 between 8 a.m. and 9 a.m.[66]

It is undisputed that CBSRT was activated,[67] established a perimeter around Decedent's house and began negotiating with him.[68]  CBSRT is a cooperation of various police departments that offer a tactical response of collective resources and manpower throughout Bucks County.[69] Plaintiffs describe it as "a multi-jurisdictional agency comprised of over eighteen (18) different townships in Bucks County, which respond to high risk incidents within Bucks County."[70] CBSRT is the result of agreements between municipalities themselves,[71] each of which has passed an ordinance, or the like, adopting such agreements.[72]  Plaintiffs claim Defendant Donnelly was the highest ranking official of CBSRT and was a decision-maker entrusted with

---

[64] Id. at 15:19-21, 34:21-25.

[65] Id. at 15:25-16:5.

[66] Id. at 23:15-19, 48:5-7.

[67] There is evidence in the record that in addition to CBSRT, members of the South-Central Bucks Emergency Response team were also present.  See Pl.'s Resp. to PSP Defs.' Mot. Ex. E ("CBSRT Call-out") at P138-P140, P143 (referencing "S. Central team"); see also Def. Bucks County's Reply ¶ 7.

[68] McLaughlin Dep. at 21:11-25.

[69] Id. at 10:3-12.

[70] Pl.'s Resp. to Def. Bucks County's Mot. ¶ 3.

[71] See Def. Bucks County's Reply Exs. 5, 6.

[72] See, e.g., Pl.'s Resp. to Bucks County's Mot. ¶ 3, Ex. A.

policymaking and the training of his subordinates.[73]

Sergeant Steve Hilias was the first CBSRT negotiator to make contact with Decedent.[74] Hilias spoke with Decedent for about six hours, consistently refusing him cigarettes until he came out.[75]  According to Plaintiff Heckenswiler, Decedent smoked one pack of cigarettes a day.[76]  Hilias told Decedent that he was "all talk."[77]  Decedent did deny to Hilias several times that he had any suicidal thoughts.[78]  Decedent also made several comments to Hilias indicating he was feeling helpless, and perhaps cornered.[79]  Ms. Witts arrived at Springfield Township Building some time between 5 p.m. and 6 p.m. and was placed in a room with Ralph Heckenswiler, from which they could hear most of the conversations between Decedent and the negotiators.[80]  Ms. Witts stated Hilias was confrontational and intimidating towards Decedent.[81]

At 12:55 a.m. on September 16, 2004, Corporal Frank Bochenek became the primary negotiator.[82]  At the same time, the decision was made to cut power to Decedent's house,

---

[73] Amend. Compl. ¶ 8.

[74] See Bucks County Reply Ex. 2 at *1.

[75] Pl.'s Resp. to PSP Defs.' Mot. Ex. E (CBSRT Event Log) at P89-P96.

[76] Heckenswiler Dep. at 39:11-18.

[77] Pl.'s Resp. to PSP Defs.' Mot. Ex. D2 (Transcript: Hostage Negotiations) at P375-P376.

[78] Def. Bucks County's Reply Ex. 2 at *2; CBSRT Event Log at P89, P93.

[79] CBSRT Event Log at P92 ("They are taking the decision away from him.  He is not in control of anything . . ."), P94 (". . . he has no control over anything . . ."), P96 ("He is worried about him not having choice.").

[80] Witts Dep. at 39:12-14, 43:1-18; Ralph Dep. at 23:2-13, 46:4-6, 49:7-17.

[81] Witts Dep. at 53:1-12.

[82] Def. Bucks County's Reply Ex. 2 at *2.

11

reportedly making Decedent irate.[83]  Bochenek continued to refuse Decedent cigarettes and the restoration of power to his house.[84]  However, both Ms. Witts and Ralph Heckenswiler stated Bochenek had the best rapport with Decedent of any of the negotiators.[85]

Corporal Carol Battistini took over as primary negotiator around 1:58 a.m.[86]  At around 2:16 a.m., CBSRT became aware that an arrest warrant for Decedent had been issued based upon an affidavit and Criminal Complaint drawn up by Defendant McLaughlin.[87]  Ms. Witts claims that Defendant McLaughlin told her the arrest warrant "will help your brother get treatment."[88]  Battistini was cleared to advise Decedent of the arrest warrant.[89]  Ms. Witts claims that Battistini was both threatening and intimidating when informing Decedent of the arrest warrant, telling him that "she was placing him under arrest and that he would go to jail."[90]  Ms. Witts claims that Battistini was "awful" to Decedent and once "she got on the phone with him, it just really went downhill."[91]  Ralph Heckenswiler stated he thought Battistini was "horrible."[92]

Decedent ultimately became unresponsive, refusing to engage in conversations with

---

[83] Id.

[84] Id.; CBSRT Event Log at P96-P97.

[85] Witts Dep. at 51:1-15; Ralph Dep at 49:23-50:3.

[86] CBSRT Event Log at P97.

[87] McLaughlin Dep. at 24:22-23; CBSRT Event Log at P98; PSP Defs.' Reply Ex. G (Police Criminal Complaint).

[88] Witts Dep. at 47:3-48:16.

[89] CBSRT Event Log at P98.

[90] Witts Dep. at 49:18-23.

[91] Id. at 50:19-21.

[92] Ralph Dep. at 50:6-8.

CBSRT negotiators until he received cigarettes.[93]  Ms. Witts stated she could not understand why they would not give Decedent cigarettes.[94]  She also claims her pleas that a psychiatrist be brought in to help handle Decedent were rebuffed.[95]  She claims the negotiators made all of Decedent's paranoia come true.[96]  Ms. Witts was not allowed to speak with Decedent directly, but she did record an audio tape of her asking him to come out.[97]  This tape was given to a "hailer team" of two negotiators speaking through a megaphone onsite outside of Decedent's residence, and was played around 2:50 a.m. with no response.[98]  Eventually, Defendant McLaughlin made the decision to request that the PSP Special Emergency Response Team ("SERT") be called in.[99]

At some point during CBSRT's involvement, both Plaintiff Heckenswiler and Ms. Witts were interviewed with regard to Decedent.[100]  Plaintiff Heckenswiler reported much of Decedent's strange behavior, including his paranoia and the fact that he had not worked in five weeks.[101]  Ms. Witts' interview also contained details of Decedent's paranoia, specifically that the house was bugged and there were people in the trees listening.[102]  Ms. Witts also stated that

---

[93] CBSRT Event Log at P98.

[94] Witts Dep. at 44:25-45:2.

[95] Id. at 53:12-54:8.

[96] Id. at 63:8-15.

[97] Id. at 45:9-11.

[98] Def. Bucks County's Reply Ex. 2 at *3.

[99] McLaughlin Dep. at 22:18-21.

[100] See CBSRT Call-out at P144-45.

[101] Id. at P144.

[102] Id. at P145.

she had called Decedent on September 9, 2004 for his birthday.[103]  Decedent told Ms. Witts that

he believed he was twelve years old and that his ten-year-old son was six.[104]  She was unable to

elicit a reasonable response from him and the conversation went no further.[105]  In CBSRT's

assessment of the situation, Decedent's reported "paranoia," "concern with not being 'crazy,'"

and repeated statements relating to choices and options were listed as issues of concern.[106]  This

information was passed on to SERT negotiators when they accepted control of the incident.[107]

     Defendants McLaughlin and Donnelly dispute who was actually in charge of CBSRT.

Defendant Donnelly claims that he was the Tactical Commander, responsible for coordinating

the physical movements of the CBSRT tactical team members so that they would not interfere

with the actions of the CBSRT negotiation team members.[108]  Defendant Donnelly states that his

involvement was limited to making recommendations regarding the movements of the CBSRT

tactical team members to Defendant McLaughlin, who was the Incident Commander.[109]

Defendant McLaughlin, however, maintains that he was simply a liaison to CBSRT,[110] and that

the scene was "essentially turned over to the Tactical Team and the negotiators."[111]  Ms. Witts

---

[103] Id.

[104] Id.

[105] Id.

[106] Id. at P146.

[107] Id.

[108] Donnelly Aff. ¶ 6.

[109] Id.

[110] McLaughlin Dep. at 20:10-19.

[111] Id. at 21:23-25.

stated that Defendant McLaughlin told her on two occasions that Defendant Donnelly was in charge.[112]  Plaintiff Musselman was also told that Defendant Donnelly was in charge.[113]

SERT was called for assistance at 2:30 a.m., and by 6:45 a.m., they had assumed control of both the perimeter and the negotiations.[114]  At that point, there had been no contact with Decedent since 2:48 a.m.[115]  Sergeant Edward C. Murphy was the Negotiation Supervisor.[116] Under his command were Corporal Dominic G. Visconti and Trooper George B. Forsyth as hailers; Corporal Michael P. King as primary negotiator; Sergeant Corporal John P. Clader as coach; and Trooper Thomas E. Barton and Sergeant Allen J. Krawczel, as technical support.[117] At approximately 6:49 a.m., the SERT negotiators tried to contact Decedent, ringing the phone several times with no answer.[118]  In an attempt to initiate negotiations between Decedent and SERT negotiators, Visconti and Forsyth began hailing Decedent at 6:58 a.m.[119]  The residence was hailed prior to and after gas was deployed, encouraging Decedent to surrender and advising him of the surrender plan.[120]  As Decedent remained unresponsive, flashbang devices were set off

---

[112] Witts Dep. at 77:10-19, 78:18-79:6.

[113] Pl.'s Resp. to PSP Defs.' Mot. Ex. B (Deposition of Terry Musselman ("Musselman Dep.")) at 76:24-77:4.

[114] Pl.'s Resp. to PSP Defs.' Mot. Ex. E (PSP General Investigation Report) at *1-*2.

[115] Id. at *2.

[116] PSP Defs.' Reply Ex. G (PSP SERT Activation Request/Record) at *2.

[117] PSP Defs.' Reply Ex. G (SERT Callout Report of Sgt. Edward C. Murphy).

[118] PSP Defs.' Reply Ex. G (SERT Callout Report of Cpl. Michael P. King) at *2.

[119] Pl.'s Resp. to PSP Defs.' Mot. Ex. E (PSP SERT Command Post Event Log ("SERT Event Log")) at P150.

[120] PSP Defs.' Reply Ex. G (SERT Callout Report of George B. Forsyth).

at 7:02 a.m. and 7:09 a.m.[121]   Decedent briefly picked up the phone at 7:39 a.m. to demand

cigarettes, but swiftly hung up.[122]   Windows were then broken at 7:50 a.m. and 7:55 a.m.[123]

Although cigarettes were delivered at 8:10 a.m., SERT negotiators were unable to communicate

this to Decedent before he hung up.[124]   An audio tape of Ralph Heckenswiler was played over the

megaphone at 8:38 a.m. and at 8:44 a.m.[125]   Decedent picked up the phone briefly during the

second playing of the tape only to hang up again.[126]

      Lt. Queen then decided, reportedly with Defendant McLaughlin's concurrence, to insert

chemical agents into the house to force Decedent's surrender.[127]   Defendant McLaughlin

maintains that he was there simply as an observer and did not authorize the use of chemical

agents.[128]   Nevertheless, rounds of tear gas were deployed at 8:48 a.m., 8:52 a.m., 8:57 a.m., and

9:08 a.m.[129]   At about 9:02 a.m., Decedent talked with King, stating that they were taking away

his options.[130]   A hotbox, a device containing tear gas, was deployed at 9:16 a.m., only to be

---

[121] Pl.'s Resp. to PSP Defs.' Mot. Ex. E (PSP SERT Chemical Agent Plan) at P111; SERT Event Log at P150.

[122] PSP Defs.' Reply Ex. D (Declaration of Lieutenant Robert Queen ("Queen Dec.")) ¶ 8.

[123] Id. ¶ 9.

[124] PSP Defs.' Reply Ex. G (SERT Callout Report of Cpl. Michael P. King) at *2; SERT Event Log at P150.

[125] Queen Dec. ¶ 11-12.

[126] Id. ¶ 12.

[127] PSP Defs.' Reply Ex. G (PSP Notification of Inquiry) at P87.

[128] McLaughlin Dep. at 23:15-21, 52:1-5.

[129] Queen Dec. ¶ 13-16.

[130] CBSERT Event Log at P104; PSP Defs.' Reply Ex. G (SERT Callout Report of Cpl. Michael P. King) at *2.

thrown back out of the house by Decedent soon thereafter.[131]  At 9:20 a.m., Decedent emerged from the house wearing a gas mask and carrying a handgun and a shot gun.[132]  He removed the mask and shot himself in the head with the shot gun.[133]

Defendant McLaughlin had informed Plaintiff Heckenswiler, Ralph Heckenswiler and Ms. Witts separately that there was "plenty of time" and that the police would "wait Decedent out."[134]  But, according to Ralph Heckenswiler, "the attitude seemed to change" when SERT arrived, with value being place on speed of resolution rather than preservation of life.[135]  Plaintiff Heckenswiler stated she was extremely surprised Decedent took his own life because "[h]e would have never left his son and me."[136]  After they were informed of Decedent's death, Ms. Witts claims that Defendant Murphy said to her, "I wish I would have known they had a gas mask."[137]

Decedent's residence, owned by Plaintiff Musselman, was severely damaged during the events of September 15 and 16, 2004.  Plaintiff Musselman claims there were holes in all of the windows, holes in the siding, and debris everywhere.[138]  Moreover, the interior was covered in

---

[131] Queen Dec. ¶ 17-18.

[132] Id. ¶ 19.

[133] Id.

[134] Heckenswiler Dep. at 37:18-20; Witts Dep. at 40:14-20; Ralph Dep. at 52:24-53:7.

[135] Ralph Dep. at 54:1-8.

[136] Heckenswiler Dep. at 46:17-23.

[137] Witts Dep. at 62:9-10.

[138] Musselman Dep. at 31:7-32:17.

purple dye and the remnants of tear gas were particularly hard to get rid of.[139]  Defendant McLaughlin claims no chemical agents or force were used by CBSRT, except to gain entry to the garage and barn.[140]  Entry to the garage and barn were made to secure the building, to check for possible escape routes from the house, and to verify that no persons were therein.[141]  Furthermore, CBSRT wanted to secure any utilities inside and turn off any lights, so that the same could not be used against police officers to blind them or give away their positions.[142]  Plaintiff Musselman stated that the screens were torn out from his garage to provide entry.[143]  He also implies there was some damage to the barn.[144]  Plaintiff Musselman stated that the destruction of his property made him feel violated, upset and angry.[145]

Plaintiffs timely filed a Complaint.  After the Court granted in part and denied in part Defendants' Motions to Dismiss, Plaintiffs filed an Amended Complaint.[146]  The claims in the Amended Complaint include violations of 42 U.S. C. § 1983 against Defendants McLaughlin, Murphy, Donnelly, Miller, John Does 1-20, Springfield Township and Bucks County; an ADA claim against Defendants Springfield Township, Bucks County, PSP and Pennsylvania; state law claims for intentional infliction of emotional distress, wrongful death, and loss of consortium

---

[139] Id. at 41:13-42:10.

[140] McLaughlin Dep. at 46:12-47:3.

[141] Id. at 47:4-8.

[142] Id. at 47:8-17.

[143] Musselman Dep. at 26:18-19.

[144] Id. at 26:19-22.

[145] Id. at 26:23-27:5.

[146] Order, May 18, 2007 [Document No. 24]; Amend. Compl. [Document No. 27].

against Defendants McLaughlin, Donnelly, John Does 1-20 and Bucks County; in addition to claims for negligence and negligent infliction of emotional distress against Defendants John Does 1-20 and Bucks County.  The Court has carefully reviewed Defendants' Motions for Summary Judgment, Plaintiff's Responses,[147] the Replies, and all accompanying materials, and this matter is now ready for disposition.

## II.  LEGAL STANDARD

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."[148]  An issue of material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[149]  In examining these motions, all inferences must be drawn in the light most favorable to the nonmovants, and their allegations must be treated as true whenever they conflict with those of the movants and are supported by proper proofs.[150]  The Court will not, however, make any credibility determinations or weigh the evidence presented.[151]

The party moving for summary judgment bears the initial burden of demonstrating that there are no genuine issues of material fact.[152]  Once the movant has done so, the opposing party

---

[147] The Court was forced to order Plaintiffs to respond.  See, Order, August 8, 2008 [Document No. 67].

[148] Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

[149] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

[150] Kopec v. Tate, 361 F.3d 772, 775 (3d Cir. 2004).

[151] Goodman v. Pa. Tpk. Comm'n, 293 F.3d 655, 665 (3d Cir. 2002) (quoting Reeves v. Sanderson Plumbing Prods., 560 U.S. 133, 150 (2000)).

[152] Fed. R. Civ. P. 56(c).

cannot rest on its pleadings.[153]  To defeat summary judgment, the nonmovant must come forward with probative evidence demonstrating the existence of genuine issues for trial.[154]  The nonmovant therefore must raise "more than a mere existence of a scintilla of evidence in its favor" for elements on which it bears the burden of production.[155]  An inference based upon speculation or conjecture will not create a material fact.[156]

## III.  DISCUSSION

      *A.*      *Defendant Bucks County*

Each Plaintiff has failed to establish a basis for imposing liability on Bucks County for the events of September 15 and 16, 2004.  As a result, the Court finds that Bucks County is entitled to summary judgment on all Plaintiffs' claims.

The Complaint premises Bucks County's liability on the allegation that "[a]t all times relevant hereto, Bucks County supervised and operated the Bucks County Emergency Response Team."[157]  However, no Plaintiff has adduced any evidence that this allegation is true.[158]  CBSRT is not an agency of Bucks County,[159] nor is Bucks County a member of CBSRT.[160]  All Plaintiffs

---

[153] Celotex, 477 U.S. at 324.

[154] Id. at 323-24.

[155] Anderson, 477 U.S. at 252.

[156] Robertson v. Allied Signal, Inc., 914 F.2d 360, 382 n.12 (3d Cir. 1990).

[157] Amend. Compl. ¶ 12.

[158] The Court acknowledges that there were two Bucks County employees present at the incident.  However, Plaintiffs do not dispute Bucks County's contention that both acted in clerical administrative capacities and were not involved in any actions relevant to this suit.  (Def. Bucks County's Reply ¶¶ 2, 4.)

[159] See Def. Bucks County's Reply Ex. 1.

[160] See id. Ex. 4.

argue that CBSRT trains at the Bucks County Public Safety/Police Training Center.  However,

no Plaintiff produces evidence that this training is related to involvement in CBSRT rather than

for employment in municipal police departments, or that the participating officers received such

training at the Bucks County site.[161]  The Court is also unpersuaded that the inclusion of the

words "Bucks" or "Bucks County" in an organization's name is sufficient, standing alone, to

impose liability on Bucks County.  Without any further proof of a connection, Defendant Bucks

County is entitled to judgment as a matter of law and the Court will grant its motion for summary

judgment on all of Plaintiffs' claims.

   B.     *Plaintiffs' § 1983 Claims*

         To prevail on each claim brought under 42 U.S.C. § 1983, Plaintiffs must demonstrate

that a state actor deprived them of a federally protected right.[162]  In Count I, Plaintiff

Heckenswiler, Administratrix, and Plaintiff Musselman claim constitutional violations actionable

under §1983 against Defendants McLaughlin, Murphy, Donnelly, Miller, John Does 1-20,

Springfield Township, and Bucks County.[163]  The Court has already held that Plaintiffs' § 1983

claim against Bucks County will be dismissed.[164]  With regard to Defendants Miller and Murphy,

the Court finds that Plaintiffs have failed to establish a basis upon which to hold them liable

under § 1983, and thus will dismiss that claim against them.[165]  However, the Court also finds

---

[161] Id. ¶ 3.

[162] Wilson v. Russo, 212 F.3d 781, 786 (3d Cir. 2000).

[163] Amend. Compl. ¶¶ 45-46.

[164] See, supra, Part III.A.

[165] See, infra, Part III.B.1, 2.

that Plaintiffs have presented sufficient evidence of a basis upon which to hold Defendants

McLaughlin and Donnelly liable and will therefore examine the merits of the § 1983 claim

against them.[166]

Plaintiffs decline to specify under what theories they are pursuing their § 1983 claim,

leaving the Court to construe their claim as best it can from the language in their Amended

Complaint.  Based on the same, the Court believes Plaintiffs are alleging six different

constitutional violations actionable under § 1983 against the remaining defendants, Defendants

McLaughlin, Donnelly, and Springfield Township.  Plaintiffs allege that Defendants McLaughlin

and Donnelly violated Decedent's rights under the Fourth Amendment by use of excessive force

and by the unreasonable seizure of his person, and under the Fourteenth Amendment by delaying

urgently needed medical treatment and by subjecting him to a state created danger.[167]  The Court

has also found that Plaintiffs allege Defendants McLaughlin and Donnelly violated Plaintiff

Musselman's rights under the Fourth Amendment by destroying his property.[168]  Finally,

Plaintiffs allege a Monell claim against Springfield Township for policies, practices, procedures

or customs that led to Plaintiffs' harm and for a failure to train.[169]  It is the general rule that "one

cannot sue for the deprivation of another's civil rights."[170]  As Plaintiff Heckenswiler has

produced no evidence of nor even argued that her own federally protected rights were violated,

---

[166] See, infra, Part III.B.3.

[167] Amend. Compl. ¶¶ 46(a)-(c), (l).

[168] Order, May 18, 2007 [Document No. 24] at *9-*10.

[169] Amend. Compl. ¶¶ 46(d)-(k).

[170] O'Malley v. Brierley, 477 F.2d 785, 789 (3d Cir. 1973) (internal citations and quotation marks omitted).

her claims under § 1983 must be dismissed.  Administratrix's claims, in contrast, are based on violations of Decedent's rights and can be maintained.

The claims for unreasonable seizure of both Administratrix and Plaintiff Musselman, as well as Administratrix's claim for delay of urgently needed medical treatment must fail as a matter of law.  Administratrix has, however, produced sufficient evidence to survive summary judgment on her claims for excessive force under the Fourth Amendment and state created danger under the Fourteenth Amendment.[171]  As Plaintiff Musselman has no underlying claim of constitutional violations, he cannot maintain a Monell claim against Springfield Township.[172] The Court finds that Administratrix's Monell claim against Springfield Township, however, will survive summary judgment.

### 1.    Supervisory Liability of Defendants Miller, Murphy, McLaughlin and Donnelly under § 1983

For state actors in supervisory positions, such as Defendants Miller, Murphy, McLaughlin, and Donnelly, liability under § 1983 can be imposed under two theories.  First, supervisor "defendants who are policymakers may be liable under § 1983 if it is shown that such defendants, 'with deliberate indifference to the consequences, established and maintained a

---

[171] Defendant McLaughlin and Donnelly both claim that they are entitled to summary judgment on Plaintiffs' § 1983 claims because of qualified immunity.  (Tp. Defs.' Mot. ¶ 11; Def. Donnelly's Mot. ¶ 12.) Defendant Donnelly's arguments that he is entitled to qualified immunity center on the limited nature of his involvement with Decedent.  (Def. Donnelly's Reply at *2, *24.)  As it is disputed what Defendant's Donnelly's role actually was, the Court declines to grant summary judgment on this basis.  Defendant McLaughlin does not argue he is entitled to the same, only mentioning it once in reference to the holdings of  Estate of Smith v. Marasco, 318 F.3d 497 (3d Cir. 2003) ("Smith I").  (Tp. Defs.' Reply at *34.)  The Court declines to make the argument for him, but also notes that constitutional violations were found in the factually similar case of Smith I, making qualified immunity questionable in this case.  318 F.3d at 510.

[172] Monell v. Dept. of Social Servs., 436 U.S. 658, 691 (1978) (finding that "Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort").

policy, practice or custom which directly caused constitutional harm.'"[173]  A supervisor defendant

will also "be personally liable under § 1983 if he or she participated in violating the plaintiff's

rights, directed others to violate them, or, as the person in charge, had knowledge of and

acquiesced in his subordinates' violations."[174]

a.    Defendant Miller

The parties do not dispute that Defendant Miller is the State Police Commissioner.[175] No

Plaintiff, however, has produced evidence that Defendant Miller established or maintained any

policy or custom that caused their harm.  Therefore, the Court cannot find Defendant Miller

liable as a policymaker.  All Plaintiffs admit that Miller was not personally involved in the

alleged constitutional violations, but they also have not adduced any evidence that Miller either

directed any actions or knew of any actions leading to their harm.  In fact, the record is devoid of

any mention of Defendant Miller or of any involvement on his part in the events at issue.  The

only evidence produced by any Plaintiff is Defendant Miller's title, but they may not rely merely

on allegations in their complaint to create a genuine issue of material fact.[176]  Thus, as each

Plaintiff has failed to demonstrate a basis upon which to impose liability on Defendant Miller, he

is entitled to summary judgment on all claims against him.

b.    Defendant Murphy

On September, 16, 2004, Defendant Murphy was at the command post as SERT

---

[173] A.M. ex rel. J.M.K. v. Luzerne County Juvenile Detention Ctr., 372 F.3d 572, 586 (3d Cir. 2004) (quoting Stoneking v. Bradford Area Sch. Dist., 882 F.2d 720, 725 (3d Cir. 1989)).

[174] A.M., 372 F.3d at 586 (quoting Baker v. Monroe Twp., 50 F.3d 1186, 1190-91 (3d Cir. 1995)).

[175] Pl.'s Resp. to PSP Defs.' Mot. ¶ 2.

[176] See Fed. R. Civ. P. 56(e)(2); Amend. Compl. ¶ 9.

24

Negotiation Supervisor.  No Plaintiff argues that he was a policymaker, and they even admit that he is not liable under § 1983 as a supervisor.[177]  Each Plaintiff does, however, argue that Defendant Murphy is directly responsible for and had supervisory responsibility over the negotiation activity which they claim violated Decedent's rights under the ADA.[178]  Although the claim against Defendant Murphy under the ADA has been dismissed,[179] the Court will consider whether his role as Negotiation Supervisor is a sufficient basis for liability under § 1983.

The Complaint states that negotiations with Decedent were not conducted in accordance with proper police procedure.[180]  Yet, the specific aspects of police negotiations listed in the Complaint were not, for the most part, actions taken by PSP negotiators.  All Plaintiffs complain of the actions taken by CBSRT negotiators, such as a female negotiator threatening Decedent with arrest, disconnection of the electricity, refusal of cigarettes and the taunting of Decedent by telling him he was "all talk."[181]  After SERT took control of the incident, Defendant Murphy was in charge of two hailers.[182]  Yet, all Plaintiffs have failed to produce any proof that the SERT hailing was improper or not conducted in accordance with police procedure.  Hence, no Plaintiff established a basis for imposing liability on Defendant Murphy under § 1983, and he is entitled to summary judgment on each of Plaintiffs' claims against him.

c.    Defendants Donnelly and McLaughlin

---

[177] Pl.'s Resp. to PSP Defs.' Mot. ¶ 2.

[178] Id. ¶ 4.

[179] See Order, May 18, 2007 [Document No. 24] at *12.

[180] Amend. Compl. ¶ 38.

[181] See id. ¶ 33(a)-(d).

[182] See id. ¶ 33(e).

Although no Plaintiff argues that either Defendant Donnelly or Defendant McLaughlin were policymakers, there is a genuine issue of material fact as to which defendant was actually in charge of the CBSRT operation, and can therefore be held liable under § 1983 either for directing action that violated Decedent's rights or for having knowledge of and acquiescing to the same. Defendant Donnelly claims that Defendant McLaughlin was in charge of the CBSRT operation. Defendant McLaughlin claims he was just an observer, while the scene had been turned over to the Tactical Team headed by Defendant Donnelly.  Moreover, Plaintiff Musselman and Ms. Witts were both told Defendant Donnelly was in charge of the CBSRT operation.  Thus, since there is a genuine issue as to whether Defendants Donnelly and McLaughlin can be held liable as supervisors under § 1983, the Court will not grant either defendant summary judgment on this basis.

Furthermore, the remaining Plaintiffs have produced sufficient evidence of Defendant McLaughlin's personal involvement in the claimed violations of Decedent's rights to also warrant a denial of summary judgment as to the claims against him.  Defendant McLaughlin widely disseminated his version of the story that Decedent pointed a gun at him, a vigorously contested fact despite the contentions of Defendants McLaughlin and Donnelly.[183]  Moreover, he not only made the decision to activate PSP but was also aware of and acquiesced in the activation of CBSRT.  Hence, Administratrix and Plaintiff Musselman have demonstrated a basis upon which § 1983 liability may be imposed upon Defendant McLaughlin, separate from his involvement with CBSRT.

### 2.    Unreasonable Seizure Under the Fourth Amendment

---

[183] See Def. Donnelly's Reply at *10, *18; Tp. Defs.' Reply at *21, *35.

The Fourth Amendment ensures "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."[184]  Administratrix claims that the seizure of Decedent was unreasonable.  However, this seizure was effected pursuant to a warrant authorized under Pennsylvania state law.[185]  A "warrant primarily serves to protect an individual from an unreasonable seizure."[186]  Two possible exceptions would be if the warrant was not supported by probable cause[187] or if reliance upon it was unreasonable.[188]  However, as Administratrix makes neither of these arguments, and the Court discerns nothing in the record to support such findings, this claim must fail.

Plaintiff Musselman claims that the destruction of Decedent's residence was an unreasonable seizure of his property.  Property is protected from unreasonable seizure under the Fourth Amendment.[189]  "A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interest in that property."[190]  Destroying property "convert[s] what had been only a temporary deprivation of possessory interest into a permanent one."[191]  Therefore, "[d]estroying property meaningfully interferes with an individual's

---

[184] U.S. Const. Amend. IV.

[185] See 50 Pa. Stat. § 7302(a)(1).

[186] Steagald v. United States, 451 U.S. 204, 212 (1981).

[187] See Malley v. Briggs, 475 U.S. 335, 344-45 (1986).

[188] See Berg v. County of Allegheny, 219 F.3d 261, 273 (3d Cir. 2000).

[189] See Soldal v. Cook County, Ill., 506 U.S. 56, 64 (1992) (noting that the shift of emphasis from property to privacy had not "snuffed out the previously recognized protection for property under the Fourth Amendment.")

[190] United States v. Jacobsen, 466 U.S. 109, 113 (1984).

[191] Id. at 124-25.

possessory interest in that property."[192]  The destruction of Plaintiff Musselman's property would violate a federally protected right if it was unreasonable.

Whether a seizure is reasonable depends upon all the surrounding circumstances and the nature of the seizure itself.[193]  The Court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion."[194]  It is undisputed that Defendant McLaughlin was involved in the destruction of the home's back door through which Decedent originally fled.  It is immaterial whether the door broke when Defendant McLaughlin attempted to thwart Decedent's escape or when Defendant McLaughlin and Officer McDonald followed Decedent as he was fleeing into the house.  Either way, the door broke when Defendant McLaughlin, while executing a valid warrant, attempted to prevent the flight of an armed subject.  The Court finds that no reasonable juror could believe that Defendant McLaughlin's actions resulting in the damage to the back door were unreasonable.

The only other damage attributable to either Defendant McLaughlin or Defendant Donnelly is that caused by CBSRT to the garage and barn.  However, Plaintiff Musselman does not dispute the tactical necessity of securing both of these buildings. Therefore, the Court finds that no reasonable juror could find CBSRT's action unreasonable.  As Plaintiff Musselman has failed to produce evidence of any unreasonable damage to his property attributable to either Defendant McLaughlin or Defendant Donnelly, his claim for unreasonable seizure under the

---

[192] Brown v. Muhlenberg Tp., 269 F.3d 205, 209 (3d Cir. 2001).

[193] United States v. Ubiles, 224 F.3d 213, 216 (3d Cir. 2000) (quoting United States v. Montoya de Hernandez, 473 U.S. 531, 537 (1985)).

[194] United States v. Place, 462 U.S. 696, 701 (1983).

28

Fourth Amendment must fail.

### 3. Special Relationship Under the Fourteenth Amendment

Administratrix claims that delaying urgently needed medical treatment was a violation of Decedent's federally protected rights under § 1983.[195]  Yet, she does not explain under what theory she is pursuing this claim.  As the claim cannot arise under the Eighth Amendment,[196] the Court identified only one other possibility—the special relationship theory under the Fourteenth Amendment.[197]

In general, there is no affirmative right to governmental aid.[198]  One exception to this rule is when "the State engages in an affirmative act of restraining the individual's freedom to act on his own behalf," such that a special relationship arises.[199]  The Supreme Court has held that "when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.,* food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by . . . the Due Process Clause."[200]  Yet, "it is the State's affirmative act of restraining the individual's freedom to act on his own behalf . . . [that] is the 'deprivation of liberty' triggering the protections of the Due Process Clause."[201]  Thus, some kind

---

[195] Amend. Compl. ¶ 46(c).

[196] See Order, May 18, 2007 [Document No. 24] at *8-*9.

[197] See D.R. by L.R. v. Middle Bucks Area Vocational Tech. Sch., 972 F.2d 1364, 1370 (3d Cir. 1992).

[198] DeShaney v. Winnebago County Dept. of Social Servs., 489 U.S. 189, 196 (1989).

[199] See D.R., 972 F.2d at 1370 (quoting DeShaney, 489 U.S. at 200).

[200] DeShaney, 489 U.S. at 200.

[201] Id.

of limitation must be imposed "on a victim's ability to act in his own interests."[202]

Administratrix has failed to demonstrate that a special relationship existed because Decedent made a choice, acting in his own interests.  Decedent chose to barricade himself in his residence in an effort to refuse the medical treatment Administratrix claims he so urgently needed.  Therefore, it was Decedent's own decision that led to the alleged delay in medical treatment, and any other deprivations he may have suffered from being barricaded in his house. The special relationship theory is meant to address situations where the plaintiff is wholly in the control of the state and unable to make any decisions regarding his own care.[203]  Here, Decedent made a decision about his own care—that he would refuse medical treatment.  This element of volition makes the special relationship theory an ill fit for this case, as Decedent still had the freedom to act on his own behalf, including the freedom to submit to the 302 warrant.  Hence, a special relationship did not arise, and the Court will grant summary judgment on this claim.

### 4.   Excessive Force Under the Fourth Amendment

Administratrix claims Defendants McLaughlin and Donnelly are liable under § 1983 for the unreasonable use of excessive force.[204]  "A claim for excessive force under the Fourth Amendment requires a plaintiff to show that a seizure occurred and that it was unreasonable."[205]

---

[202] Horton v. Flenory, 889 F.2d 454, 458 (3d Cir. 1989).

[203] See, Collins v. City of Harker Heights, Tex., 503 U.S. 115, 127 (1992) (noting that Fourteenth Amendment protection under the special relationship theory extends to pretrial detainees, persons in mental institutions, convicted felons, and persons under arrest; see also D.R., 972 F.2d at 1372 (holding the state owed a duty to children placed in foster care under the special relationship theory).

[204] Amend. Compl. ¶ 46(a).

[205] Curley v. Klem, 298 F.3d 271, 279 (3d Cir. 2002).

A seizure occurs "[w]henever an officer restrains the freedom of a person to walk away."[206] Although Defendant Donnelly argues that Plaintiffs cannot establish that a seizure occurred, the record is clear that both the Springfield Township Police Department and CBSRT maintained a perimeter around Decedent's residence with the intent of arresting him should he attempt to leave.  Therefore, although Decedent chose to remain inside the house, his movement was restrained sufficiently to constitute a seizure.  Furthermore, the use of excessive force is itself considered "an unlawful 'seizure' under the Fourth Amendment."[207]  Therefore, the Court holds that Administratrix has sufficiently demonstrated that a seizure occurred.

The reasonableness analysis for an excessive force claim "must be evaluated from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight and must embody the allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are often tense, uncertain, and rapidly evolving—about the amount of force necessary in a particular situation."[208]  This inquiry "turns on objective reasonableness, meaning that the standard is whether the police officer's actions [were] objectively reasonable in light of the facts and circumstances facing the officer, regardless of the officer's intent or motivation."[209]  Factors for the Court to consider in this analysis include: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety

---

[206] <u>Rivas v. City of Passaic</u>, 365 F.3d 181, 198 (3d Cir. 2004) (<u>quoting</u> <u>Tennessee v. Garner</u>, 471 U.S. 1, 7 (1985)).

[207] <u>Couden v. Duffy</u>, 446 F.3d 483, 496 (3d Cir. 2006) (<u>quoting</u> <u>Graham v. Connor</u>, 490 U.S. 386, 395 (1989).

[208] <u>Rivas</u>, 365 F.3d at 198 (<u>quoting</u> <u>Graham</u>, 490 U.S. at 396-97) (quotation marks omitted).

[209] <u>Rivas</u>, 365 F.3d at 198 (<u>quoting</u> <u>Graham</u>, 490 U.S. at 397) (quotation marks omitted).

of the officers or others; (3) whether he is actively resisting arrest or attempting to evade arrest by flight; (4) duration of the officers' action; (5) whether the action takes place in the context of effecting an arrest; (6) possibility that the suspect may be armed; and (7) the number of persons with whom the police officers must contend at one time.[210]

Here, Decedent did not commit a crime, and police officers had to contend with only one person.  Moreover, the incident spanned over two days, and CBSRT was involved for over twelve hours.  Thus, the first, fourth and seventh factors weigh in Administratrix's favor.  Decedent did, however, actively resist a mental health commitment, and was armed.  Furthermore, the incident at issue was in the context of executing a warrant for the involuntary commitment of Decedent.  Hence, the Court believes that the third, fifth, and sixth factors weigh against Administratrix.  Yet, it is a genuine issue of material fact whether Decedent actually posed any threat, immediate or otherwise.  As the disputed facts are so evenly balanced, the Court finds that a reasonable juror could find for Administratrix, and therefore will not grant summary judgment on this claim.

## 5.    State Created Danger Under the Fourteenth Amendment

Administratrix claims Defendants McLaughlin and Donnelly violated Decedent's constitutional rights by subjecting him to a state created danger.[211]  The state created danger theory under the Fourteenth Amendment applies when "discrete, grossly reckless acts committed by the state or state actors, leav[es] a discrete plaintiff vulnerable to foreseeable injury."[212]  To

---

[210] Couden, 446 F.3d at 496-97.

[211] Amend. Compl. ¶ 46(l).

[212] Kneipp v. Tedder, 95 F.3d 1199, 1208 (3d Cir. 1996) (quoting Mark v. Borough of Hatboro, 51 F.3d 1137, 1153 (3d Cir. 1995)).

succeed in this claim, Administratrix must establish that (1) the harm ultimately caused was foreseeable and fairly direct; (2) a state actor acted with a degree of culpability that shocks the conscience; (3) a relationship between the state and the plaintiff; and (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.[213]  Drawing all inferences in a light most favorable to Administratrix, the acts of Defendant McLaughlin at issue here are his wide dissemination of the possibly false story that Decedent brandished a firearm, his involvement both in the decision to activate CBSRT and in CBSRT's actions, and his decision to activate SERT.  As for Defendant Donnelly, only the actions of CBSRT can support a claim against him.

The first issue is whether Decedent's death was foreseeable and fairly direct.  Defendant McLaughlin's reports portray Decedent as dangerous and capable of violence, and would conceivably have a large impact on how Decedent was perceived and treated by the police officers involved.  CBSRT's negotiation tactics seemed to only provoke Decedent further, causing him to become unresponsive and withdrawn.  Moreover, Decedent made several comments that he had no control and was perhaps feeling trapped, but these were ignored.  Finally, the activation of CBSRT and SERT itself is "an overwhelming show of force—force far greater than that normally applied in police encounters with citizens."[214]  Thus, a reasonable juror could find that Defendants' actions made a confrontation inevitable, and under such

---

[213] Bright v. Westmoreland County, 443 F.3d 276, 281 (3d Cir. 2006) (citations and quotation marks omitted).

[214] Smith I, 318 F.3d at 517 (quoting Hollander v. Harrington, 268 F.3d 1179, 1190 (10th Cir. 2001)).

circumstances, harm to Decedent was both foreseeable and fairly direct.[215]

In Smith I, the Third Circuit required a showing of "a level of gross negligence or arbitrariness that shocks the conscience" to support a finding of state created danger when police officers were confronting what they believed to be a barricaded gunman.[216]  The Court will apply the same standard to this claim.  "The exact degree of wrongness necessary to reach the 'conscience-shocking' level depends upon the circumstances of a particular case."[217]  Yet, when a state actor "must act with some urgency—'proof that the defendants consciously disregarded, not just a substantial risk, but a great risk that serious harm would result'" is sufficient.[218]  Here, a reasonable juror could find that Defendant McLaughlin disseminated his story with the intention of getting Decedent treatment, but did not confirm that the other officers knew it to be false or failed to consider the possible ramifications of making Decedent appear dangerous.  Furthermore, a jury could find that the activation of CBSRT and SERT resulted in the unwarranted escalation of the situation, and CBSRT's negotiation tactics totally disregarded Decedent's mental condition.  Hence, a reasonable trier of fact could conclude that the actions of Defendants McLaughlin and Donnelly shocked the conscience.

---

[215] It is not necessary that the exact nature of the harm suffered be foreseeable.  See, e.g., Rivas, 365 F.3d at 195 (finding the harm that befell Mr. Rivas foreseeable even though Mr. Rivas was physically restrained and stuck several times by police officers, in addition to falling off a stretcher and down a flight of stairs headfirst); Kneipp, 95 F.3d at 1208 (finding the harm foreseeable because Mrs. Kneipp was more likely to fall and injure herself when the harm ultimately suffered was permanent brain damage caused by anoxia as a result of hypothermia); but cf. Smith I, 318 F.3d at 507 (finding it was foreseeable that Mr. Smith would suffer a heart attack in the woods, given the officer's awareness of his condition and the discovery that he had did not have his medication).

[216] Smith I, 318 at 508-9.

[217] Estate of Smith v. Marasco, 430 F.3d 140 (3d Cir. 2005) ("Smith II") (quoting Miller v. City of Philadelphia, 174 F.3d 368, 375 (3d Cir. 1999)).

[218] Rivas, 365 F.3d at 195-96 (quoting Ziccardi v. City of Philadelphia, 288 F.3d 57, 66 (3d Cir. 2002)).

The third prong of the test is whether "the plaintiff was a foreseeable victim of the defendant's acts in a tort sense."[219]   In other words, whether it was foreseeable that "plaintiff as a member of a discrete class of persons [would be] subjected to the potential harm brought about by the state's actions."[220]   This test excludes "those instances when the state actor creates only a threat to the general population."[221]   Defendant McLaughlin claimed that Decedent brandished a gun at police officers.   CBSRT and SERT were activated to resolve the situation caused by Decedent arming and barricading himself within his residence.   CBSRT's actions were directed at the same.   Thus, Decedent was certainly a foreseeable victim of Defendants McLaughlin and Donnelly's actions.

To satisfy the fourth prong, there must be an affirmative act by a state actor, as it is the "misuse of state authority, rather than a failure to use it, that can violate the Due Process Clause."[222]   Yet, this doctrine is not limited "to cases where third parties caused the harm."[223]   Rather, Administratrix must establish that (1) a state actor exercised his or her authority; (2) the state actor took an affirmative action; and (3) this act created a danger to the citizen or rendered the citizen more vulnerable to danger than if the state had not acted at all.[224]

It is clear that all of defendants' actions were taken in their official capacities as police officers and were exercises of the authority that arises therefrom.   Moreover, Defendant

---

[219] Kniepp, 95 F.3d at 1209 n.22.

[220] Morse v. Lower Merion Sch. Dist, 132 F.3d 902, 913 (3d Cir. 1997).

[221] Id.

[222] Bright, 443 F.3d at 282.

[223] Smith I, 318 F.3d at 506.

[224] Ye v. United States, 484 F.3d 634, 638 (3d Cir. 2007) (quoting Bright, 443 F.3d at 281-82).

McLaughlin telling others that Decedent pointed a gun at him, the decisions to activate CBSRT and SERT, and CBSRT's negotiation tactics and maintenance of a perimeter are all affirmative actions.  Finally, Administratrix must demonstrate that Defendants McLaughlin and Donnelly's actions were the "but for" cause of Decedent's harm.[225]  There must be a direct causal relationship between the affirmative act of a state actor and Decedent's harm.[226]  There is no evidence that Decedent was suicidal before this incident.  Given the negotiation tactics used, the continual escalation of the situation, and Decedent's repeated comments about feeling trapped, a reasonable trier of fact could conclude that but for defendants' actions, Decedent would not have committed suicide.

Administratrix has produced enough evidence for a reasonable juror to find that each of the prongs of the state created danger test are satisfied.  Hence, Defendants McLaughlin and Donnelly are not entitled to summary judgment on this claim.

### 6.    Monell Claim Against Springfield Township

Administratrix seeks to hold Springfield Township liable under § 1983 for violations of Decedent's federally protected rights.  A municipality, however, cannot be held liable under § 1983 solely on a theory of *respondeat superior*.[227]  It will be held responsible only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury."[228]  A single

---

[225] Ye, 484 F.3d at 642-43; Rivas, 365 F.3d at 197 (determining "whether the state actor used his or her authority to create an opportunity, which otherwise would not have existed, for specific harm to occur").

[226] Ye, 484 F.3d at 643 (quoting Kaucher v. County of Bucks, 455 F.3d 418, 432 (3d Cir. 2006)).

[227] Monell v. Dept. of Social Servs., 436 U.S. 658, 691 (1978).

[228] Id. 436 U.S. at 694.

decision is sufficient to impose liability.[229]

There are three situations where acts of government employees may be deemed to be the result of a policy or custom of the government entity for whom the employee works, thereby rendering the entity liable under § 1983: (1) where the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy; (2) where a policy or custom exists and the policymaker has failed to act affirmatively at all, although the need to take some action to control the agents of the government is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need; and (3) where no rule has been announced as policy but federal law has been violated by an act of the policymaker itself.[230]

Administratrix does not identify any objectionable policy or custom promulgated by Springfield Township.  Therefore, the first two exceptions do not apply.  Administratrix could argue that Springfield Township's failure to properly train its emergency responders for mental health situations should fall under the second exception.  However, she has failed to produce any evidence that the Decedent's harm was due to a lack of training on the part of the participating police officers.  Moreover, a failure to train claim usually requires a pattern of violations.[231] Administratrix has adduced no evidence to this effect.  A violation can still be found in the absence of a pattern of violations when "the likelihood that the situation will recur and the

---

[229] Pembaur v. Cincinnati, 475 U.S. 469, 480 (1986).

[230] Jiminez v. All Am. Rathskeller, Inc., 503 F.3d 247, 250 (3d Cir. 2007).

[231] Berg v. County of Allegheny, 219 F.3d 261, 276 (3d Cir. 2000).

predictability that an officer lacking specific tools to handle that situation will violate citizens'

right could justify a finding that policymakers' decision not to train the officer reflected

'deliberate indifference' to the obvious consequence of the policymakers' choice."[232]  Yet again,

however, Administratrix has produced no evidence in support of such a finding.

Nevertheless, Springfield Township can still be liable under the third exception if

Defendant McLaughlin is a policymaker, thereby imputing his actions to the municipality itself.

A policymaker has final authority to establish municipal policy with respect to the action

ordered,[233] but whether a municipal employee is a policymaker is a question of state law.[234]

Springfield Township does not dispute that Defendant McLaughlin is a policymaker.[235]

Therefore, Springfield Township can be liable under § 1983 to the extent that Defendant

McLaughlin's actions violated Decedent's federally protected rights.  As there is still a genuine

issue of material fact as to whether Defendant McLaughlin violated Decedent's rights,[236]

Springfield Township is not entitled to summary judgment on this claim.

C.    ADA Claim

Administratrix brings an ADA claim against Springfield Township, PSP and

Pennsylvania for failing to make reasonable accommodations to ensure the safe execution of an

involuntary mental-health commitment warrant.  Title II of the ADA provides that  "[n]o

---

[232] Id.

[233] Pembaur, 475 U.S. at 481.

[234] City of St. Louis v. Praprotnik, 485 U.S. 112, 124-25 (1988).

[235] See Tp. Defs.' Reply at *41.

[236] See supra, Part III.C, E.

qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."[237]  The Court has already determined that safely serving an involuntary mental-health commitment warrant is a service or activity covered by Title II.[238]  Thus, in order to survive summary judgment, Administratrix need only establish that (1) Decedent had a disability, (2) Decedent was denied the benefit of a service to which he was entitled, and (3) Decedent was denied the same by reason of his disability.[239]

A disability is defined as (1) a physical or mental impairment that substantially limits one or more major life activities, (2) a record of such an impairment, or (3) being regarded as having such an impairment.[240]  Mental disease, such as depression, qualifies as a mental impairment.[241] When determining if an impairment substantially limits a major life activity, the "essence of the inquiry regards comparing the conditions, manner or duration under which the average person in the general population can perform the major life activity at issue with those under which an impaired plaintiff must perform."[242]  Both working and thinking are considered major life

---

[237] 42 U.S.C. § 12132 (2000).

[238] See Order, May 18, 2007 [Document No. 24] at *14.

[239] See 42 U.S.C. § 12132.

[240] 42 U.S.C. § 12102 (1990).

[241] See, e.g., Conneen v. MBNA Am. Bank, N.A., 334 F.3d 318, 321 (3d Cir. 2003) (finding that a plaintiff suffering from major depressive episode with severe psychotic symptoms and who was prescribed Effexor had a qualifying disability).

[242] Emory v. Astrazeneca Pharmaceuticals LP, 401 F.3d 174, 179-80 (3d Cir. 2005) (quoting Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 307 (3d Cir. 1999)).

activities.[243]

Administratrix has produced sufficient evidence for a reasonable trier of fact to find that Decedent had a mental impairment that substantially limited the major life activities of working and thinking.  Decedent stopped going to work four to six weeks before the events at issue, and a reasonable juror could find it was because he believed people at work were talking about him.  Moreover, Decedent reportedly suffered from paranoia and delusions, believing that there was a conspiracy against him, that his house was bugged and that lights were being shone through the windows of his house.  It would be reasonable to conclude that Decedent's mental impairment substantially limited his ability to think.[244]  Thus, the Court finds Administratrix has produced sufficient evidence that Decedent had a qualifying disability.

Even if Decedent did not have a disability, he was certainly regarded as having one.  Defendant McLaughlin was well aware of Decedent's mental condition and the fact that he was not working.  He was not only faxed a copy of the 302 warrant, but also spoke with Plaintiff Heckenswiler regarding the same.  Moreover, the interviews of Plaintiff Heckenswiler and Ms. Witts conducted by CBSRT and the list of "issues" based on the same make clear that CBSRT members at the command post also knew about Decedent's reported paranoia and that he had stopped working.[245]  The SERT negotiators were privy to this information as well.  Thus, each of the parties involved knew that Decedent may have been suffering from paranoia and delusions,

---

[243] See Williams v. Philadelphia Housing Auth. Police Dept., 380 F.3d 751, 763 (3d Cir. 2004) (holding that the plaintiff had a qualifying disability under the ADA when plaintiff's depression impaired his ability to work); Taylor, 184 F.3d at 307 (holding that thinking is included as a major life activity).

[244] See Taylor, 184 F.3d at 307-8.

[245] CBSRT Call-out at P146.

and that he was not working.  Hence, a reasonable juror could conclude that Decedent was regarded as having a mental impairment that substantially limited major life activities.

Administratrix also produced sufficient evidence that Decedent was not served the involuntary mental-health commitment order in a safe manner.  There are genuine issues of material fact as to what exactly occurred when Defendant McLaughlin initially attempted to serve the warrant.  A reasonable juror could believe Ralph Heckenswiler's version that Decedent never brandished a gun, and that he spoke with Defendant McLaughlin within arms length and through an open door for a long period of time.  Moreover, a reasonable trier of fact could find that the negotiation tactics employed by CBSRT and the rapid escalation of force by SERT both resulted in Decedent being deprived of a service to which he was entitled.

Finally, Administratrix can establish that Decedent was deprived of the benefits of a service to which he was entitled by reason of his disability if she can demonstrate that reasonable accommodations were not made for Decedent's disability.[246]  The Court finds that Administratrix has produced sufficient evidence of the same.  All the parties involved knew of Decedent's paranoia and in his sister's words, they made "all of his paranoia come true."[247]  A psychiatrist was never consulted nor utilized, despite Ms. Witts' suggestion.  CBSRT's tactics of denying Decedent cigarettes and shutting off the electricity to his house only increased Decedent's agitation and caused him to become unresponsive.  Decedent's lack of response to SERT negotiators only led to an escalation of force.  Finally, Decedent's verbal indications that he was feeling trapped and cornered, with few to no options, were ignored.  Hence, a reasonable trier of

---

[246] 28 C.F.R. § 35.130(b)(7) (1998).

[247] Witts Dep. at 63:11.

41

fact could decide that reasonable accommodations were not made for Decedent's disability.

Defendant Springfield Township argues that under <u>Haize v. Richards</u>, the protections of the ADA should not apply, because there is no duty to reasonably accommodate Decedent's disability in handling and transporting him to a mental health facility until "the area is secure and there is no threat to human safety."[248]  In <u>Haize</u>, the mentally ill individual approached officers with a knife in his hand, shouting profanities and ignoring the officers' orders to stop.[249]  The court found that requiring officers to use "less than reasonable force in defending themselves and others, or to hesitate to consider other possible actions in the course of making such split-second decisions" was not within the "reasonable accommodations" considered by Title II.[250]  Here, it is a genuine issue of material fact as to whether reasonable force was used.[251]  Furthermore, Decedent was barricaded in his house and surrounded by police officers for over fifteen hours. During that time, there is no evidence that police officers ever felt a threat of immediate harm from Decedent forcing them to respond in kind.  There is even a genuine issue of material fact as to whether Decedent brandished a gun at Defendant McLaughlin, the sole claim that Decedent threatened  a police officer with violence.  Thus, the Court finds <u>Haize</u> inapposite[252] and will not grant summary judgment on Administratrix's claim under the ADA.

     *D.*     *State Law Claims*

---

[248] 207 F.3d 795, 802 (5th Cir. 2000).

[249] <u>Id.</u> at 799.

[250] <u>Id.</u> at 801-2.

[251] <u>See</u>, <u>supra</u>, Part III.B.4.

[252] The Court also notes that <u>Haize</u> is a decision from the Fifth Circuit and therefore is not binding precedent with respect to this action.

In addition to their federal claims, Plaintiffs also bring a claim under Pennsylvania law for intentional infliction of emotional distress against Defendants McLaughlin and Donnelly. Plaintiff Heckenswiler, individually, brings claims for wrongful death and loss of consortium against the same Defendants.  Defendants McLaughlin and Donnelly claim they are immune from these claims, or in the alternative, that these claims fail as a matter of law.  The Court finds that Defendant McLaughlin and Donnelly are entitled to immunity on Plaintiffs Heckensilwer and Musselman's claim for intentional infliction of emotional distress, but not on Administratrix's.  Immunity will not be granted on Plaintiff's Heckenswiler's claims for wrongful death and loss of consortium either.  Moreover, the Court holds that the remaining state law claims do not fail as a matter of law.

### 1.    Official Immunity

Under Pennsylvania law, government units are generally immune from suit under state law.[253]  Employees of those government units, acting within the scope of their duties, share that same immunity.[254]  However, there is an exception for "willful misconduct."[255]  In King v. Breach, the Pennsylvania Commonwealth Court found the term "willful misconduct" to be

---

[253] 42 Pa. Cons. Stat. Ann § 8541 (2007) ("Except as otherwise provided in this subchapter, no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person."); see also id. § 8501 (defining "local agency" as a "government unit other than the Commonwealth government").

[254] Id. § 8545 ("An employee of a local agency is liable for civil damages on account of any injury to a person or property caused by acts of the employee which are within the scope of his office or duties only to the same extent as his employing local agency and subject to the limitations imposed by this subchapter.").

[255] Id. § 8550 ("In any action against a local agency or employee thereof for damages on account of an injury caused by the act of the employee in which it is judicially determined that the act of the employee caused the injury and that such act constituted . . . willful misconduct, [immunity] shall not apply.").

"synonymous with the term 'intentional tort.'"[256]  The court defined willful misconduct as when

"the actor desired to bring about the result that followed or at least was aware that it was

substantially certain to follow, so such desire can be implied."[257]  The Pennsylvania Supreme

Court in Renk v. City of Pittsburgh, however, held that King's equation of willful misconduct

with intentional tort "has no validity in the context of a lawsuit based upon police conduct."[258]

Interpreting Renk, the Third Circuit has required "a showing of an intention to do what is known

to be wrong."[259]

　　At the time of the events at issue, Defendant McLaughlin was an employee of Springfield

Township, and Defendant Donnelly of Doylestown Borough.[260]  Therefore, they are both

generally immune from suit under state law unless their actions constituted willful misconduct.

Under King, Defendants McLaughlin and Donnelly would not be immune from Plaintiffs' claims

for intentional infliction of emotional distress.[261]  Under Renk, however, Plaintiffs must

demonstrate that Defendants McLaughlin and Donnelly engaged in conduct they knew to be

---

[256] 540 A.2d 976, 981 (Pa. Commw. Ct. 1988).

[257] Id.

[258] 641 A.2d 289, 293 (Pa. 1994).

[259] In re City of Philadelphia Litig., 158 F.3d 723, 728 (3d Cir. 1998); see also Sameric Corp. of Del. v. City of Philadelphia, 142 F.3d 582, 600-01 (3d Cir. 1998) (requiring defendant members of the Philadelphia Historical Commission "actually knew that their conduct was illegal"); cf. Bright, 443 F.3d at 287 (citing the language of King when analyzing the immunity of a police officer who failed to arrest a parolee before the parolee murdered plaintiff's daughter); Brown, 269 F.3d at 214 (citing the language of King when analyzing the immunity of a police officer who shot plaintiffs' dog).

[260] Def. Donnelly's Reply at *22.

[261] The Court acknowledges that it initially analyzed Defendants McLaughlin and Donnelly's immunity defense under this standard.  See Order, May 18, 2007 [Document No. 24] at *16-*19.  However, even if the Court had applied the Renk standard, the result would have been the same at that early stage of litigation.

extreme and outrageous with the intention of causing severe emotional distress.[262]

The Court finds that Administratrix has produced sufficient evidence for her claims of intentional infliction of emotional distress to survive.  A reasonable juror could find that it was extreme and outrageous for Defendant McLaughlin to describe Decedent brandishing a gun and widely disseminate the story, knowing it to be false.  It could also be found that Defendant McLaughlin did so with the intention that Decedent be treated as dangerous, resulting in such emotional distress that he committed suicide.  Furthermore, a reasonable trier of fact could also conclude that CBSRT's negotiation tactics were meant to cause Decedent severe emotional distress, ultimately leading to his suicide.  Thus, to the extent Defendants McLaughlin or Donnelly ordered or directed CBSRT's negotiation activities, they could have engaged in willful misconduct.  Hence, it is a genuine issue whether Defendants McLaughlin and Donnelly are immune from Administratrix's claim, and the Court cannot grant summary judgment based on immunity.  As Plaintiff Heckenswiler's claims for wrongful death and loss of consortium flow from the same willful misconduct as Administratrix's claim for intentional infliction of emotional distress, Defendants McLaughlin and Donnelly are not entitled to summary judgment based on immunity on those claims either.

Plaintiff Heckenswiler, however, has produced no evidence that any extreme or outrageous conduct by Defendants McLaughlin and Donnelly was directed towards her, much less intended to cause her emotional distress.  Even though Plaintiff Heckenswiler is Decedent's wife and her grief is certainly tragic and foreseeable, she has still failed to show an intention to

---

[262] See Hoy v. Angelone, 720 A.2d 745, 753 (Pa. 1998) (citation omitted) (defining the tort of intentional infliction of emotion distress as when "one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another").

45

cause her injury.  Thus, under <u>Renk</u>, the Court will grant Defendants McLaughlin and Donnelly immunity from this claim.

With respect to Plaintiff Musselman, he has not shown that either Defendant McLaughlin or Defendant Donnelly intended to cause him emotional distress.  Plaintiff Musselman does not dispute that there were reasonable explanations for the damage done to his property by Defendant McLaughlin and CBSRT.[263]  Therefore, Plaintiff Musselman has failed to demonstrate an intent to cause him severe emotional distress.  Hence, Defendants McLaughlin and Donnelly are immune to his claim for intentional infliction of emotional distress, and the Court will grant summary judgment on the same.[264]

### 2.        Intentional Infliction of Emotional Distress

According to the Pennsylvania Supreme Court, "one who by extreme or outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm."[265]  As outlined above, Administratrix has adduced sufficient evidence for a reasonable trier of fact to rule in their favor on their claims of intentional infliction of emotional distress.[266]  Defendant Donnelly argues that this tort does not exist under Pennsylvania law. While the Court agrees there is some confusion as to whether this tort has been formally

---

[263] <u>See</u>, <u>supra</u> Part III.B.2.

[264] Even if the Court were to apply the <u>King</u> standard in this case and find that Defendants McLaughlin and Donnelly were not immune to this claim, Plaintiff Musselman's claim would still fail as a matter of law.  As the actions of Defendant McLaughlin and CBSRT which caused damage to Plaintiff Musselman's property were both reasonable, he is unable to demonstrate extreme or outrageous conduct upon which to base his claim.

[265] Hoy, 720 A.2d at 753.

[266] <u>See</u>, <u>supra</u> Part III.D.1.

recognized, Defendant Donnelly is unable to cite a single case which refuses to recognize it. Most courts simply assume it exists without explicitly deciding.[267]  This Court will do the same.

### 3.      Wrongful Death and Loss of Consortium

Plaintiff Heckenswiler brings two derivative claims against Defendants McLaughlin and Donnelly.  The first claim for wrongful death allows the recovery of damages "for the death of an individual caused by the wrongful act or neglect or unlawful violence or negligence of another."[268]  As a reasonable juror could find that Decedent's death was caused by Defendants McLaughlin and Donnelly's wrongful acts in intentionally causing Decedent emotional distress, summary judgment cannot be granted on this claim.

Defendant McLaughlin contends that suicide is not a legitimate basis for recovery in wrongful death cases.  Yet, in <u>McPeake v. Cannon</u>, the case involving suicide relied upon by Defendant McLaughlin, the defendant was merely negligent.[269]  Here, Plaintiff Heckenswiler claims that the wrongful actions of Defendants McLaughlin and Donnelly's were intentional. Moreover, the rationale of the court was that "suicide constitutes an independent intervening act so extraordinary as not to have been reasonably foreseeable by the original tortfeasor."[270]  Such language has great relevance in negligence cases, but little for intentional torts where liability extends far beyond foreseeability.[271]  Hence, the Court holds that Plaintiff Heckenswiler's

---

[267] See Hoy, 720 A.2d at 754 n.10; <u>see also</u> Shaner v. Synthes, 204 F.3d 494, 507 n.10 (3d Cir. 2000).

[268] Darr Constr. Co. v. Workmen's Comp. Appeal Bd., 715 A.2d 1075, 1080 (Pa. 1998).

[269] 553 A.2d 439, 441 (Pa. Super. 1989).

[270] <u>Id.</u>

[271] <u>Rowe v. Marder</u>, 750 F. Supp. 718, 724 (W.D. Pa. 1990) (<u>citing</u> Prosser & Keeton, The Law of Torts 40 (5th ed. 1984)).

wrongful death claim may be maintained even though Decedent committed suicide.

Plaintiff Heckenswiler's loss of consortium claim is an action for spousal damages to compensate for "a loss of services, society, and conjugal affection of one's spouse."[272]  As Decedent's intentional infliction of emotional distress is the underlying tort to this claim, the Court will not grant Defendants McLaughlin and Donnelly summary judgment on the same.

## IV.    CONCLUSION

For all the reasons stated above, summary judgment will be granted as to all of Plaintiffs' claims against Defendants Bucks County, Miller and Murphy.  Furthermore, Plaintiff Heckenswiler's claims under § 1983 are dismissed.  Summary judgment will be granted on Administratrix's and Plaintiff Musselman's claims under § 1983 for unreasonable seizure, as well as Administratrix's claim for special relationship.  It will not be granted, however, on Administratrix's claims against Defendants McLaughlin and Donnelly for excessive force and state created danger, nor will it be granted on her Monell claim against Springfield Township. Administratrix's ADA claim against Springfield Township, PSP and Pennsylvania State will also survive.  Although Plaintiffs Heckenswiler and Musselman's state law claim against Defendants McLaughlin and Donnelly for intentional infliction of emotional distress must fail, Administratrix's will survive.  Finally, the Court will deny summary judgment on Plaintiff Heckenswiler's derivative state law claims for wrongful death and loss of consortium against Defendants McLaughlin and Donnelly.

An appropriate order follows.

---

[272] Darr, 715 A.2d at 1080.

48

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| **DEBORAH HECKENSWILER, on her own behalf, and as Administratrix of the Estate of John Heckenswiler, deceased, et al.,** | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| **Plaintiffs,** | : | |
| **vs.** | : | **CIVIL NO. 06-4151** |
| | : | |
| **CHIEF BRIAN K. MCLAUGHLIN, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

**ORDER**

**AND NOW**, this 29th day of September 2008, upon consideration of Defendants' Motions for Summary Judgment (Document Nos. 51, 52, 53, and 58), Plaintiffs'[273] Responses (Document Nos. 68, 69, 70, and 71), and Defendants' Replies (Document Nos. 73, 79, 84, and 85), and in accordance with the attached Memorandum Opinion, it is hereby **ORDERED** that said Motions are **GRANTED IN PART** and **DENIED IN PART**, as follows:

1.  Defendant Bucks County's Motion is **GRANTED**.  Accordingly, all claims against Defendant Bucks County are **DISMISSED**;

2.  Defendants Murphy and Miller's Motion is **GRANTED**.  Accordingly, all claims against Defendants Murphy and Miller are **DISMISSED**;

3.  Defendants McLaughlin, Donnelly, and Springfield Township's Motions are **GRANTED** as to Plaintiff Heckenswiler's claims under § 1983.  Accordingly, those

---

[273] The Plaintiffs include Deborah Heckenswiler and Terry Musselman.  Deborah Heckenswiler has brought claims both individually and in her capacity as Administratrix for the estate of John Heckenswiler.  When Deborah Heckenswiler is being referred to in her individual capacity, she is called Plaintiff Heckenswiler.  When she is being referred to in her capacity as representative of the estate of John Heckenswiler, she is called Administratrix.

claims are **DISMISSED**;

4.  Defendants McLaughlin and Donnelly Motions are **GRANTED** as to Plaintiff Musselman's claim under § 1983 for unreasonable seizure.  Accordingly, that claim is **DISMISSED**;

5.  Defendants McLaughlin and Donnelly's Motions are **GRANTED** as to Administratrix's claims under § 1983 for unreasonable seizure under the Fourth Amendment and for special relationship under the Fourteenth Amendment. Accordingly, those claims are **DISMISSED**;

6.  Defendants McLaughlin and Donnelly's Motions are **DENIED** as to Administratrix's claims under § 1983 for excessive force under the Fourth Amendment and for state created danger under the Fourteenth Amendment;

7.  Defendant Springfield Township's Motion is **GRANTED** as to Plaintiff Musselman's <u>Monell</u> claim under § 1983.  Accordingly, that claim is **DISMISSED**;

8.  Defendant Springfield Township's Motion is **DENIED** as to Administratrix's <u>Monell</u> claim under § 1983;

9.  Defendants Springfield Township and Pennsylvania State Police's Motions are **DENIED** as to Administratrix's claim under the ADA;

10. Defendants McLaughlin and Donnelly's Motions are **GRANTED** as to Plaintiffs Heckenswiler and Musselman's state law claims for intentional infliction of emotional distress.  Accordingly, those claims are **DISMISSED**;

11. Defendants McLaughlin and Donnelly's Motions are **DENIED** as to Administratrix's state law claim for intentional infliction of emotional distress; and

12. Defendants McLaughlin and Donnelly's Motions are **DENIED** as to Plaintiff

Heckenswiler's state law claims for wrongful death and loss of consortium.

Plaintiff's remaining claims are Adminstratrix's claims under § 1983 for excessive force under the Fourth Amendment and for state created danger under the Fourteenth Amendment against Defendants McLaughlin, Donnelly, and John Does 1-20, as well as the <u>Monell</u> claim against Springfield Township.  Administratrix also maintains an ADA claim against Defendants Springfield Township, Pennsylvania State Police and the Commonwealth of Pennsylvania, as well as a state law claim for intentional infliction of emotional distress against Defendants McLaughlin, Donnelly, and John Does 1-20.  Plaintiff Heckenswiler maintains state law claims for wrongful death and loss of consortium against Defendants McLaughlin, Donnelly, and John Does 1-20.  Finally, all Plaintiffs maintain state law claims of negligence and negligent infliction of emotional distress against John Does 1-20.

Plaintiffs shall **SHOW CAUSE** within fourteen (14) days as to why Defendants John Does 1-20 should not be dismissed in light of this Court's April 17, 2007 Order [Document No. 21].

It is so **ORDERED**.

**BY THE COURT:**

**/s/ Cynthia M. Rufe**

_____

**CYNTHIA M. RUFE, J.**